IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SHANNON L. KELLY,

    Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    Defendant.

                                      /

No. C 06-04816 JSW

**ORDER GRANTING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND
DENYING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT**

    Now before the Court is the motion for summary judgment filed by Plaintiff Shannon L. Kelly ("Kelly") and the cross-motion for summary judgment filed by the Commissioner of the Social Security Administration ("Commissioner"). Pursuant to Civil Local Rule 16-5, the motions have been submitted on the papers without oral argument. Having carefully reviewed the administrative record and considered the parties' papers and the relevant legal authority, and good cause appearing, the Court hereby DENIES Kelly's motion for summary judgment and GRANTS the Commissioner's cross-motion for summary judgment.

**BACKGROUND**

    Kelly brings this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of the Commissioner denying her request for Social Security benefits. Kelly was 36 years old at the time of the decision at issue. (Certified Transcript of Record Proceedings ("Tr."), at 31.) She has a high school education and previously worked as a data entry clerk, cashier, fast food worker, and outside deliverer. (Tr. at 84-97.) Kelly has not engaged in

1  substantial gainful activity since her alleged onset of disability of July 18, 2002.  (Tr. at 112.)

2   Kelly's relevant medical history began in June 2002 when she started experiencing
3  abdominal pain that forced her to stop working in July 2002.  (Tr. at 100.)  Kelly underwent
4  surgery to remove a hernia on September 25, 2002.  (Tr. at 254.)  In February 2003, Kelly
5  started pain management at North Bay Pain Care with Dr. David Suchard to relieve abdominal
6  pain.  (Tr. at 198.)  Dr. Suchard referred her to Dr. Mary McGrath, who removed two more
7  hernias on July 14, 2003 (Tr. at 166-67.)  In February and March 2004, Kelly received
8  treatment from Drs. Allen Gruber and Stephen Steady for further pain relief.  (Tr. at 202-06,
9  288-91.)  On April 1, 2004, Dr. James Stone diagnosed Kelly with fatigue, depression, and
10 chronic abdominal pain.  (Tr. at 248.)  He prescribed Zoloft, but Kelly did not follow up for
11 treatment as requested.  (*Id.*)  On April 12, 2004, Kelly consulted with Dr. Elpidio Mariano, but
12 he found no further hernias.  (Tr. at 293-302.)  In May 2004, Kelly began nerve block treatment
13 by Dr. James Hurd but did not receive much pain relief.  (Tr. at 352-78.)  During this period in
14 2004, Kelly was also seeing Dr. John Shearer at the El Rose Medical Group for treatment of her
15 abdominal pain.  (Tr. at 263-86.)

16  Kelly began treatment by Dr. Eileen Gleber for chronic abdominal wall pain related to
17 her hernias on November 4, 2004.  (Tr. at 472.)  Dr. Gleber prescribed Vicodin, but on
18 November 15, 2004, Kelly returned to Dr. Gleber's office to request a change of medication to
19 Norco and Xanax.  (Tr. at 471.)  The nurse practitioner noted chronic back pain, abdominal
20 pain, and depression, but explained that Dr. Gleber might not agree to changing her pain
21 medication.  (*Id.*)  On December 13, 2004, Dr. Gleber diagnosed Kelly with abdominal pain and
22 fatty liver, most likely secondary to Tylenol, and ordered Kelly to stop taking Tylenol products,
23 including Vicodin and Norco.  (Tr. at 468.)  Dr. Gleber prescribed Oxycontin three times a day,
24 which gave Kelly some relief.  (Tr. at 467-68.)  On January 5, 2005, Dr. Gleber diagnosed Kelly
25 with chronic abdominal pain, obesity, fatty liver, and depression.  (Tr. at 467.)  Three weeks
26 later, Dr. Gleber prescribed Cymbalta and referred Kelly to a mental health professional for
27 counseling.  (Tr. at 465.)  In 2004 and 2005, Kelly also periodically complained of back, neck,
28 and knee pain. (Tr. at 456, 470, 546-47.)

On January 15, 2004, Kelly applied for Disability Insurance Benefits under Title II of the Social Security Act, alleging an inability to work beginning July 18, 2002 due to stomach pain. (Tr. at 99.)  The application was denied initially on August 20, 2004 and upon reconsideration on December 20, 2004. (Tr. at 38-51.)  Kelly then requested an administrative hearing before an administrative law judge ("ALJ"). (Tr. at 52.)  Kelly, a vocational expert, and a medical expert appeared at the de novo hearing before ALJ Charles D. Reite on August 15, 2005. (Tr. at 490-543.)  On November 8, 2005, the ALJ found that Kelly was not disabled and therefore not entitled to benefits because she retained the residual functioning capacity to perform a significant number of jobs in the national economy. (Tr. at 18-32.)

Kelly's request for administrative review was denied on June 9, 2006, by the Appeals Council and an action was filed in this Court. (Tr. at 7-10.)  On February 5, 2007, Kelly brought the instant motion for summary judgment.  On March 6, 2007, the Commissioner filed a cross-motion for summary judgment, arguing that the ALJ's determination is supported by substantial evidence and is free of legal error.  On March 12, 2007, Kelly filed her response to the Commissioner's cross-motion for summary judgment.

**ANALYSIS**

**A.     Standard of Review of Commissioner's Decision to Deny Social Security.**

A federal district court may not disturb the Commissioner's final decision unless it is based on legal error or the findings of fact are not supported by substantial evidence. 42 U.S.C. § 405(g); *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998).  "Substantial evidence means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995).  To determine whether substantial evidence exists, courts must look at the record as a whole, considering both evidence that supports and undermines the ALJ's findings.  *Reddick*, 157 F.3d at 720.  The ALJ's decision must be upheld, however, if the evidence is susceptible to more than one reasonable interpretation.  *Id*. at 720-21.

3

**B.     Legal Standard for Establishing A Prima Facie Case for Disability.**

The plaintiff has the burden of establishing a prima facie case for disability. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984). The ALJ follows a five-step process in determining whether the claimant is disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *see* 20 C.F.R. § 404.1520. First, the claimant must not be engaging in substantial gainful activity. 20 C.F.R. § 416.920(b). Second, the claimant's impairment must be "severe." 20 C.F.R. § 416.920(c). Third, when the claimant has an impairment that meets the duration required and is listed in Appendix 1 (a list of impairments presumed severe enough to preclude work located in subpart P of part 404 of 20 C.F.R. § 416.920), or is equal to a listed impairment, benefits are awarded without considering the claimant's age, education, and work experience. 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner assesses the claimant's residual functioning capacity ("RFC") to determine if the claimant can perform past work. 20 C.F.R. § 416.920(e). Benefits are denied if the claimant can do past work. *Id.* Fifth, if the impairment prevents the claimant from doing past relevant work, the claimant's age, education, work experience, and residual functioning capacity are considered to see if the claimant is capable of performing other work that exists in the national economy. 20 C.F.R. § 404.1520(g). The claimant is not entitled to benefits if the claimant can adjust to other work. *Id.* The claimant has the burden of proof at steps one through four; the burden shifts to the ALJ at step five. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

In the first step of his analysis, the ALJ found Kelly was not working. (Tr. at 31.) In the second step, the ALJ found that Kelly suffered from two severe impairments: "lower abdominal wall pain, status post multiple hernia surgeries and repair of nerve entrapment and scar tissue of undetermined etiology; and low back pain." (*Id.*) The ALJ also found several non-severe impairments: "left knee sprain and pain, status post four knee surgeries in the 1980's and July 2003; adjustment disorder secondary to physical condition; and obesity." (*Id.*) Third, the ALJ found Kelly's impairments did not meet or medically equal the listings found in 20 C.F.R., Part 404, Subpart P, Appendix 1. (*Id.*) In the fourth step, the ALJ found that Kelly was unable to

4

1  perform her past work. (*Id.*)  In the fifth step, based on the vocational expert's testimony,

2  Kelly's age, education, past work, and residual functioning capacity, the ALJ found that Kelly

3  is able to perform other jobs that exist in significant numbers in the regional and national

4  economies. (Tr. at 31-32.)  Therefore, the ALJ concluded that Kelly is not disabled. (Tr. at 32.)

**C.  The ALJ's Determination That Kelly Is Not Disabled Is Supported by Substantial Evidence and Is Free of Legal Error.**

Kelly argues that the ALJ's decision should be reversed because the ALJ committed legal error and his decision was not supported by substantial evidence.  Specifically, Kelly contends that the ALJ: (1) improperly determined that her mental impairment is nonsevere; (2) erred in failing to explain why he rejected one of the answers to hypothetical questions posed to a vocational expert; and (3) failed to consider the side-effects of Kelly's medications on her ability to work.  The Court will address each of these arguments in turn.

**1.  The ALJ Properly Determined that Kelly's Mental Impairment Is Nonsevere.**

Kelly asserts that the ALJ erred in concluding her mental impairment was nonsevere because that determination conflicted with the evaluations of the examining psychiatrist and the non-examining state agency physicians.  A nonsevere mental impairment is an impairment that "does not significantly limit [a claimant's] mental ability to do basic work activities."  20 CFR § 404.1521(a).  Examples of basic work activities include "understanding, carrying out, and remembering simple instructions," "use of judgment," and "responding appropriately to supervision, co-workers and usual work situations."  20 C.F.R. § 404.1521(b).

**a.  The examining psychiatrist's report supported the ALJ's conclusion.**

Contrary to Kelly's assertions, the report by the only examining psychiatrist supported the ALJ's conclusion that she suffered from a nonsevere mental impairment.  An examining physician's report alone can constitute substantial evidence supporting an ALJ's determination regarding an impairment. *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).  In *Allen*, the ALJ denied disability benefits based on an examining physician's thirty minute consultative examination, even though it conflicted with the claimant's treating physician. *Id.*  The court

5

1 found that the examining physician's conclusions constituted substantial evidence, especially
2 because the findings rested on his own examination of the claimant and not simply "check
3 marks in boxes on a form supplied by the Secretary." *Id.* (quoting *Murray v. Heckler*, 722 F.2d
4 499, 502 (9th Cir. 1983)).

5 Here, the ALJ found that Kelly suffered from a nonsevere adjustment disorder
6 secondary to a physical condition. (Tr. at 28.) In so finding, the ALJ cited to the report of Dr.
7 Ronald Johnson. (*Id.*) Dr. Johnson is a state agency psychiatrist and the only doctor of record
8 who performed a psychiatric examination. (Tr. at 311-14.) He diagnosed Kelly with "mood
9 disorder due to the impact of her medical and surgical condition, with mixed symptoms of mild
10 to moderate anxiety and depression," and with "pain disorder associated with both
11 psychological factors and a general medical condition." (Tr. at 313.) The report noted that
12 Kelly "is capable of understanding simple and even moderately complex instructions, and there
13 appears to be no psychological impediment to her carrying out related functions." (Tr. at 314.)
14 Although Dr. Johnson found Kelly "is discouraged and mildly to moderately depressed and
15 anxious over the absence of relief from her treatment for pain," he found "no gross vegetative
16 signs of depression, no evidence of psychomotor retardation, and no evidences of psychotic
17 thinking or gross distortions or reality testing." (Tr. at 313-14.) He also found that she was
18 alert to his questions and "able to list clearly her numerous medications, and seemed generally
19 very alert in terms of describing the medical and surgical advice she has received." *Id.*
20 Although Johnson had some difficulty in assessing Kelly's judgment in interpersonal matters,
21 he noted how she was in a marriage of eight years, completed high school, has a background of
22 employment, and "was cooperative and generally courteous in [the] examination." (Tr. at 313.)
23 Johnson also described Kelly as able to perform simple numerical tasks well and that she was of
24 "average basic intelligence," and "oriented in all three spheres." *Id.* Finally, Dr. Johnson found
25 Kelly "was efficient and clear in her communications, inquiries, and arrangements for this
26 examination." (Tr. at 314.) Overall, Dr. Johnson's description, diagnosis and prognosis present
27 ample evidence to support the ALJ's finding that Kelly's mental impairments did not
28 significantly limit her ability to do basic work activities. *See Peres Torres v. Secretary of*

6

*Health and Human Services*, 890 F.2d 1251, 1255 (1st Cir. 1989) (finding similar evidence supported the ALJ's conclusion that claimant's mental impairment was nonsevere).

Dr. Johnson's diagnosis of "mixed symptoms of mild to moderate depression" does not contradict the ALJ's finding of a nonsevere mental impairment. In *Peres Torres*, the ALJ considered a similar diagnosis of depression and the court affirmed his decision to classify the claimant's mental impairment as nonsevere. 890 F.2d at 1255. In that case a psychiatrist diagnosed the claimant with "severe dysthymic disorder," which is a "chronic mood disturbance involving either a depressed state or a loss of interest or pleasure in almost all usual activities and pastimes." *Id.* at 1253. The same psychiatrist also found the claimant "could not adapt to work stress or concentrate adequately to perform productive labor, that he had difficulty with interpersonal relations and often became irritable, hostile and tearful." *Id.* In addition, a state agency psychiatrist performed an evaluation and diagnosed the claimant with "dysthymic disorder-moderate depression," but found the claimant had "logical, coherent and relevant thought content, good contact with reality, adequate mental process, but slight to moderate psychomotor retardation." *Id.* The non-examining state agency physicians that reviewed the records found that the claimant's mental impairment was nonsevere. *Id.* at 1254. The Ninth Circuit relied on the aforementioned evidence in upholding the ALJ's finding that the claimant's mental impairment was nonsevere, and concluded that the claimant's "mental condition was mild." *Id.* at 1255.

Here, Dr. Johnson's report describes the claimant with fewer limitations on her ability to perform basic job activities than the claimant in *Peres Torres*, who was also found to have nonsevere mental impairments. Therefore, Dr. Johnson's description of mixed symptoms of mild to moderate depression does not conflict with the ALJ's finding of a nonsevere mental impairment. In sum, Dr. Johnson's psychiatric evaluation alone served as substantial evidence to support the ALJ's findings that Kelly suffered from a nonsevere mental impairment.

### b. The ALJ adequately addressed the non-examining physicians' opinions.

Kelly also asserts that the ALJ did not properly consider the findings of the non-examining state agency physicians because they found that she suffers from a severe mental

7

1 impairment. In assessing the evidence, the ALJ should generally give the opinions of an
2 examining physician greater weight than the opinion of a non-examining physician. *Lester v.*
3 *Chater*, 81 F.3d 821, 830 (9th Cir. 1995) (citing *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.
4 1990)). However, the regulations provide that the ALJ "must explain in the decision the weight
5 given to the opinions of a State agency medical or psychological consultant or other program
6 physician or psychologist." 20 C.F.R. § 404.1527(f)(2)(ii). Although the ALJ is not bound by
7 the findings of the state agency psychologists, he "must explain in the decision the weight given
8 to the opinions in their decisions." Social Security Ruling (SSR) 96-6P, 1996 WL 374180 (July
9 2, 1996); *see also Holohan v. Massanari*, 246 F.3d 1195, 1203 n.1 (9th Cir. 2001) (finding that
10 Social Security Rulings do not have the force of law but are binding on all components of the
11 Social Security Administration and are given "some deference" by the court). On the other
12 hand, the opinions of state agency psychologists "can be given weight only insofar as they are
13 supported by evidence in the case record." SSR 96-6P.
14 Kelly contends that the ALJ erred in finding she has a non-severe mental impairment
15 because the non-examining state agency physicians classified her mental impairment as severe.
16 The Commissioner's regulations state that the ALJ will determine the severity of the claimant's
17 mental impairment after it rates the degree of functional limitations resulting from that
18 impairment. 20 C.F.R. § 404.1520a(d). The four areas of functional limitation are: 1) activities
19 of daily living, 2) social functioning, 3) concentration, persistence, or pace, and 4) episodes of
20 decomposition. 20 C.F.R. § 404.1520a(c)(3). If the ALJ rates the limitations in the functional
21 areas as "mild" or "none," he will generally conclude that the claimant's impairment is not
22 severe. 20 C.F.R. § 404.1520a(d)(1). If the ALJ finds the claimant has a severe mental
23 impairment that neither meets nor is equivalent in severity to any listing, he will then assess the
24 claimant's RFC. 20 C.F.R. § 404.1520a(d)(3).
25 Here, the first non-examining state agency physician found that Kelly had mild
26 limitations in "restrictions of daily living" and mild to moderate restrictions in "maintaining
27 social functioning" and "maintaining concentration, persistence, or pace." (Tr. at 343.) The
28 physician proceeded to complete a full mental RFC assessment. (Tr. at 347-50.) The second

8

non-examining state agency physician found moderate limitations in the three functional limitations and also proceeded to complete a full mental RFC assessment (Tr. at 386-97.) Thus, by assessing Kelly's RFC, the two non-examining State agency physicians implicitly classified Kelly's mental impairments as severe.

Although the ALJ was required to address the opinions of the state agency physicians, the ALJ adequately explained the weight he gave to their opinions. In his decision, the ALJ cited to the state agency findings, including both mental RFC reports. (Tr. at 30.)[1] The ALJ agreed with the state agency physician's overall conclusion that the claimant is not disabled, but disagreed with their RFC's. The ALJ explained that the state agency physicians "did not have the benefit of the updated medical evidence and the testimony of claimant and the vocational expert." (*Id.*) Thus, the ALJ did discuss the weight he gave to the opinions of the non-examining physicians.

Moreover, the ALJ was correct in giving greater weight to Dr. Johnson's report by citing it as support for finding Kelly's mental impairment was nonsevere. Dr. Johnson's opinion as an examining psychologist is entitled to greater weight than the opinion of non-examining physicians. *Lester*, 81 F.3d at 830. In addition, Dr. Johnson's extensive report, filled with detailed descriptions of his examination, offers far greater insight into Kelly's mental impairment than the non-examining physician's check-list report. *See Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) (finding the ALJ permissibly rejected psychological evaluations "because they were check-off reports that did not contain any explanation of the bases of their conclusions."). Because Dr. Johnson's report alone constituted substantial evidence, the ALJ was only required to explain the weight given to opinions of the non-examining physician. *Allen*, 749 F.2d at 579; 20 C.F.R. § 404.1527(f)(2)(ii); SSR 96-6P. Having fulfilled this requirement, the ALJ correctly relied on the examining psychologist's opinion in concluding that Kelly's mental impairment was nonsevere.

---

[1] The administrative record appears to contain a typographical error in pagination. Page 10 of 12 of the ALJ's decision (Tr. at 21-32) is labeled as "20," while the page number should properly be labeled as "30."

9

### c. Kelly's treating physicians did not contradict Dr. Johnson's report.

Finally, the ALJ could properly conclude that Kelly suffers from a nonsevere mental impairment in light of her treating physicians' diagnoses of depression. Drs. Stone and Gleber briefly noted that Kelly suffers from depression. (Tr. at 248, 465, 471.) Yet these conclusory diagnoses offer very little elaboration and are not based on a full psychiatric evaluation. *See Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2001) ("The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings."); *Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir. 2000) (finding the ALJ properly favored the opinions of two examining physicians over a treating physician's opinion because the examining physicians' reports were "far more thorough"); 20 C.F.R. § 404.1527(d)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion."). Neither Drs. Stone nor Gleber explained how they concluded that Kelly suffers from depression or describe the extent of her depression. From the record available, their diagnoses appear to be based on Kelly's self-reporting and not based on substantive psychological evaluations. Yet the ALJ extensively discussed why he discounted Kelly's credibility and gave little weight to her subjective complaints. (Tr. at 28-29.) Thus, to the extent that Drs. Stone and Gleber based their diagnoses on Kelly's subjective complaints, the ALJ properly discounted those opinions. *See Andrews*, 53 F.3d at 1043 (upholding the ALJ's decision to give less weight to diagnoses based on the self-reporting of an unreliable person). In addition, there is no evidence that Kelly sought mental health treatment when Dr. Gleber referred Kelly to a mental health specialist for proper counseling. Kelly's failure to seek treatment for her depression further diminishes her credibility and the complaints on which her diagnoses were based. *See Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989) (finding that failure to seek treatment or follow a prescribed course of treatment is evidence to discredit subjective complaints).

When the opinion of a treating physician conflicts with that of an examining physician, the ALJ must set forth "specific, legitimate reasons" for rejecting the treating physician's opinion." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Winans v. Bowen*,

10

1    853 F.2d 643, 647 (9th Cir. 1987)).  However, the brief mention of depression by Kelly's
2    treating physicians do not contradict Dr. Johnson's diagnosis of mild to moderate depression.
3    Dr. Johnson's examination merely elaborates on the treating physicians' findings and describes
4    the extent of Kelly's mental impairment.  Because the examining psychologist's report does not
5    contradict the opinion of the treating physicians, the ALJ was not required to give specific,
6    legitimate reasons for relying on the examining psychologist's report.  Therefore, because Dr.
7    Johnson's report alone constituted substantial evidence, the ALJ did not err in finding that Kelly
8    suffered from a nonsevere mental impairment.

### 2. The ALJ Properly Rejected the Vocational Expert's Response to the ALJ's Hypothetical Question.

11   Kelly also asserts that the ALJ erred by not explaining why he rejected one of the
12   vocational expert's responses to his hypothetical questions.  At step five of the ALJ's disability
13   determination, the Commissioner can use the testimony of a vocational expert to meet his
14   burden of proving that the claimant can do other kinds of work.  *Osenbrock*, 240 F.3d at 1162.
15   The testimony of a vocational expert "is valuable only to the extent that it is supported by
16   medical evidence."  *Magallanes*, 881 F.2d at 756 (quoting *Sample v. Schweiker*, 694 F.2d 639,
17   642 (9th Cir. 1982)).  The ALJ may rely on a vocational expert's testimony if the restrictions
18   contained in the ALJ's hypothetical are supported by the record.  *See id.* at 757 (finding the ALJ
19   properly relied on testimony by a vocational expert when the restrictions in the ALJ's
20   hypothetical were "amply supported by the record").

21   Here, the ALJ asked the vocational expert three hypothetical questions to assess Kelly's
22   ability to perform other kinds of work.  (Tr. at 538-40.)  The first hypothetical included a series
23   of physical limitations that essentially matched the ALJ's final physical RFC in his decision.
24   (Tr at 31, 538-39.)  The vocational expert testified that someone with those limitations would be
25   capable of performing work as a food and beverage order clerk, a stone setter, or an assembler-
26   optical goods.  (Tr. at 539-40.)  The second hypothetical included the physical limitations of the
27   first hypothetical, but added a limitation on concentration, pace or persistence so that such a
28   person could "match about 85% of what you'd expect out of the super employee."  (Tr. at 540.)

1  The vocational expert eliminated the order clerk position but testified that the two remaining
2  positions could still be performed. (*Id.*) The third hypothetical included the physical
3  limitations of the first hypothetical, but changed to a "moderate level of concentration, pace,
4  and persistence, based on chronic pain and medication," which was "about 66% of what the
5  super employee would be able to maintain during a workday." (*Id.*) The vocational expert
6  testified that all possible positions would be eliminated. (*Id.*)

7  The ALJ found that Kelly had an RFC with "mild limitation in concentration,
8  persistence and pace," as well as several physical limitations. (Tr. at 31.) A "mild" limitation
9  appears to match the type of limitation presented to the vocational expert in the second
10 hypothetical. That hypothetical included a relatively slight limitation of 85% of what a "super
11 employee" could maintain, as compared to the ALJ's description of 66% being a "moderate"
12 limitation. (Tr. at 540.) The ALJ explained that, based on the vocational expert's testimony,
13 someone with that type of RFC was capable of work as a stone setter and as an assembler-
14 optical goods. (Tr. at 30.) Thus, the ALJ's dismissal of the vocational expert's third
15 hypothetical is appropriate if the ALJ properly concluded that Kelly only had mild limitations in
16 pace, persistence and concentration.

17 As discussed above, substantial evidence supports the ALJ's finding that Kelly's
18 limitation was mild and not moderate. Therefore, the ALJ did not err in failing to explain his
19 reasons for rejecting the response of the vocational expert to the third hypothetical because
20 ample evidence supported his reliance on the second hypothetical.

21 **3.   The ALJ's Treatment of Kelly's Side Effects From Medication Was Proper.**

22 Finally, Kelly contends that the ALJ failed to consider the side-effects of her
23 medications and how they would effect her ability to work. Credibility determination are the
24 province of the ALJ. *Fair*, 885 F.2d at 604. In addition, the court gives "great weight to an
25 ALJ's credibility assessment." *Brawner v. Secretary of Health and Human Services*, 839 F.2d
26 432, 433 (9th Cir. 1988). In *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005), the
27 claimant asserted that the ALJ erred in failing to explicitly address the side effects of the her
28 medication. The Ninth Circuit concluded that the ALJ was only obligated to address limitations

12

1  for which there was record support that did not depend on claimant's subjective complaints,
2  which the ALJ found was not credible. *Id.* Moreover, in *Miller v. Heckler*, 770 F.2d 845, 849
3  (9th Cir. 1985), the court noted that the claimant has the burden of proving that an impairment
4  is disabling. The court upheld the ALJ's rejection of the claimant's disability because the
5  claimant "produced no clinical evidence showing that narcotics use impaired his ability to
6  work." *Id.*; *see also Osenbrock*, 240 F.3d at 1164 ("There were passing mentions of the side
7  effects of [claimant's] medication in some of the medical records, but there was no evidence of
8  side effects severe enough to interfere with [claimant's] ability to work.")

9  Here, the ALJ did consider the side-effects of Kelly's medication. He noted in his
10 decision how Dr. Rack "said that Oxycontin taken once or twice a day should not produce a lot
11 of side effects." (Tr. at 26) Although Kelly takes Oxycontin three times a day, there is no
12 objective evidence that such levels of medication had more than a mild effect on her. Dr. Rack
13 testified about the drug's potential side-effects, but did not provide evidence for the ALJ to
14 conclude that Kelly would be more than mildly limited by those side-effects. The ALJ asked
15 Dr. Rack whether someone taking Oxycontin once or twice a day would suffer "clouding of
16 their mentation." (Tr at 516.) Dr. Rack explained that it depended on the amount they're taking
17 and how often, but it "shouldn't produce a significant amount of problem [sic] from that point
18 of view." (*Id.*) When asked about whether someone would feel "groggy" as a side-effect, Dr.
19 Rack responded that any "patient who uses a narcotic can have that kind of problem taking a
20 narcotic and if that's the case then the narcotic has to be reduced and something substituted for
21 it." (*Id.*) Next, when asked whether someone can be "confused in the sense of not being able to
22 think clearly," Dr. Rack stated that such a "possibility can occur and the same kind of statement
23 would from my vantage point would pertain to that. If that's going on then you can't use that
24 drug, you got to go to something different." (*Id.*) Overall, Dr. Rack's testimony merely
25 demonstrates that Oxycontin can, in some cases, cause some form of mental side-effects, but his
26 testimony does not provide evidence that Kelly was taking an amount of Oxycontin that was
27 likely to cause such effects or that she actually was suffering from such effects.
28

13

The only record support for the proposition that Kelly was suffering from side-effects of Oxycontin that substantially effected her ability to work is her own testimony. Kelly testified that her medication makes her disoriented and prevents her from concentrating. (Tr. at 527.) However, Kelly indicated in her appeal that she does not suffer from any side-effects from Oxycontin. (Tr. at 118.) Moreover, the ALJ adequately addressed Kelly's subjective complaints and found her credibility to be "very poor." (Tr. at 29.) The ALJ noted how Kelly has been through "a parade of doctors to try to diagnose and treat her multiple alleged symptoms" and how several doctors could find no objective cause for Kelly's self-reported pain. (Tr. at 28-29.) He also described how Dr. Gruber found Kelly had a "clear tendency to over-report the severity of her pain" and noted Kelly's "inconsistency of Rx use, marginal compliance with dose intervals." (Tr at 29.) Furthermore, the ALJ noted how both Drs. Stone and Gruber agreed that Kelly had demonstrated "acclimatization to prolonged 24/7 home life." (*Id.*) The ALJ also described how Kelly "presented very histrionic and inconsistent behavior" at the hearing. (Tr. at 29) Such behavior included using crutches even though there was no evidence that they had been prescribed by a treating source and that the medical expert noted that crutches were contraindicated for lumbar back pain. (Tr. at 29-30.) In sum, the ALJ gave ample support for his finding that Kelly's credibility was very poor and that he therefore dismissed much of her subjective complaints.

Overall, the record supports the ALJ's finding of mild limitations in concentration, persistence or pace, as related to the side effects of Kelly's medication. Kelly's subjective testimony is the only evidence of more substantial limitations, but the ALJ properly discredited her subjective complaints. As a result, the ALJ was not obligated to address more substantial limitations for which there was no record support aside from her complaints. Therefore, the ALJ properly considered the side-effects of Kelly's medication.

///

///

///

///

**CONCLUSION**

For the foregoing reasons, this Court hereby DENIES Kelly's motion for summary judgment, and hereby GRANTS the Commissioner's cross-motion for summary judgment.

**IT IS SO ORDERED.**

Dated: August 10, 2007

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

15